# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| NAJA A. STOKES, | : | Case No. 2:22-cv-3921 |
| | : | |
| Petitioner, | : | |
| | : | |
| vs. | : | Judge Edmund A. Sargus, Jr. |
| | : | Magistrate Judge Peter B. Silvain, Jr. |
| | : | |
| WARDEN, SOUTHEASTERN | : | |
| CORRECTIONAL INSTITUTION, | : | |
| | : | |
| Respondent. | : | |

---

## REPORT AND RECOMMENDATIONS

Petitioner, a state prisoner proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court to consider the Petition (Doc. 1), the Return of Writ (Doc. 5), Petitioner's Reply (Doc. 11), and the state court record. (Docs. 4, 4-1). For the reasons that follow, it is **RECOMMENDED** that this action be **DENIED** and **DISMISSED**.

## I.     FACTUAL BACKGROUND

On October 4, 2018, in Case Number 18-CR-4943, a Franklin County, Ohio grand jury indicted Petitioner on six counts related to the sexual assault of "E.W.": one count of felonious assault (count one), four counts of rape (counts two, three, four, and six), and one count of kidnapping (count five). (Doc. 4, at PAGEID #21-23). On February 20, 2019, in Case Number 19-CR-880, a Franklin County, Ohio grand jury indicted Petitioner on four counts related to the sexual assault of "A.D.": three counts of rape (counts one, two, and three) and one count of kidnapping (count four). (*Id.* at PAGEID #25-26). On July 15, 2019, the state filed a motion to try the two

cases jointly. (*Id*. at PAGEID #30-32). Petitioner, through appointed counsel, opposed the state's joinder motion on the grounds that there was no evidence that the two offenses arose out of the same transaction or a common scheme or plan.  (*Id*. at PAGEID #33-35). A formal disposition of the state's joinder motion is not included in the record, but the two indictments were tried jointly by jury on November 13-14, 2019. (Doc. 4-1, at PAGEID #347-717).  The Court of Appeals found that the following facts were adduced at trial:

{¶ 2} This case arises out of the rape and kidnapping of two women in the Linden area of Columbus, Ohio in April 2018. In the case of one of the victims, E.W., appellant was also charged with felonious assault.

{¶ 3} Victim A.D. testified that in April 2018, she was addicted to opioids and working as a prostitute in order to support her drug habit. On the date of trial, A.D. was in jail for drug-related charges. Though she admitted she was experiencing opiate withdrawal while on the witness stand, she answered "yes" when the prosecutor asked her if she was "at least relatively sober." She identified appellant, as he sat in the courtroom, as the man who picked her up in early April 2018 near the intersection of Hudson Street and Duxberry Avenue for the purpose of exchanging money for sex. According to A.D., in a typical transaction the parties agree to "[e]xchange the money, do the deed, be done." A.D. testified the customer, also known as a "john[ ]," would pull his vehicle to the curb, flag her down, and drive the vehicle to a more secluded area where the sex act would take place, usually in the vehicle. She also stated that she would "sometimes" agree to go wherever the john wanted, including a private residence or other dwelling where the sex would take place.

{¶ 4} When she was asked if she remembered the day when appellant picked her up at the intersection of Hudson Street and Duxberry Avenue, she responded: "Kind of, ya." She stated that appellant was driving a blue "truck-ish thing" that looked like a Ford Explorer. A.D. recalled appellant took her to his home, and she recognized the residence from a photograph shown to her by the prosecutor. She remembered that after they entered the home, she observed appellant prop a board against the front door to secure it. A.D. testified all the windows were "boarded up from the inside out."

{¶ 5} According to A.D., when they went upstairs to have sex, both she and appellant removed their clothing, but appellant refused to pay. When A.D. told

2

appellant she was leaving and began putting her clothes back on, appellant told her: "No. You're either going to do what I want you to do or I'm going to do it whether you like it or not." Appellant then "threatened me that the dogs he had were going to eat me if I tried to run." A.D. testified she never saw any dogs, but she could hear them barking outside. Appellant then demanded she perform oral sex and pushed her head down so violently that he split her lip. Appellant proceeded to have vaginal intercourse with A.D. against her will and demanded she perform oral sex twice. She believed he ejaculated during vaginal intercourse.

{¶ 6} A.D. recalled that it was "super cold" in the bedroom where the rape took place "like nobody lived there" and that she remembered seeing a television and "[m]aybe * * * shelves that were connected in the wall." A.D. testified she was held against her will in the bedroom from 2:00 or 3:00 in the morning until daybreak and that appellant was raping her "pretty much the entire time." On cross-examination, A.D. admitted she entered appellant's home with the intent to exchange sex for money, but she withdrew her consent when appellant refused to pay.

{¶ 7} A.D. left appellant's home crying, and she told "people that I was living with" about the crime. A.D. maintained she did not go to the hospital or to the police because she knew she had outstanding warrants. She stated that she eventually told her counselor about the crime after she learned others had come forward. A.D. agreed to testify against appellant "[b]ecause I don't think he should be able to do this to anyone else."

{¶ 8} On cross-examination, A.D. admitted that she did not ask for any money from appellant until they went upstairs to his bedroom. According to A.D., she refused sex only after he refused to pay her. A.D. testified appellant let her go after committing the rape when she "told him a friend had took down his license plate."

{¶ 9} Victim E.W. testified that in April 2018, she was addicted to heroin and crack cocaine, and she had been working as a prostitute on Hudson Street for approximately one year when she encountered appellant. E.W. stated she now lives in Chillicothe, Ohio, and she graduated from drug rehabilitation about 8 months prior to trial. E.W. had been sober for 14 months at the time she gave her testimony, and she stated she wants to train as a paramedic to help other addicts.

{¶ 10} E.W. testified that in April 2018, her usual practice was to approach the john's vehicle, get in, collect the money, and then pull over somewhere or go to the john's home where she would "handle business, and then I'd leave." She answered

"[y]es" when she was asked if she got paid up front. E.W. identified appellant as he sat in the courtroom as the man who picked her up on April 5, 2018, in a navy blue Ford Explorer at the corner of Hudson Street and Hiawatha Street. She knew it was a Ford Explorer because she had owned the same type of vehicle before she became addicted to drugs.

{¶ 11} E.W. testified when she got in appellant's vehicle, she said: "Oh it's cold. You ain't got no heat?" Appellant responded: "I got some at my house. Let's go." E.W. testified appellant took her to a residence on Duxberry Avenue near Hamilton Avenue, approximately one block from where she was living. She identified State's Exhibit D-1 as a photograph of appellant's home, but she stated there was a chain link fence around the property when appellant took her there. She recalled the windows of the home were boarded up and when she went inside, appellant propped a two by four up against a metal bar attached to the inside of the front door.

{¶ 12} According to E.W., she asked for money before going upstairs, but appellant told her: "Bitch, you know what it is." E.W. testified she still believed appellant would pay her when she asked him what he wanted. However, when she asked for money a second time, appellant "started getting violent," and he told her "I'm going to choke you. I'm going to choke you." E.W. testified the last thing she remembered before passing out was appellant on top of her on the couch with his hands around her neck while she tried to kick him off. When E.W. regained consciousness, she was in a bedroom, tied naked to the bed with cables wrapped around her hands and feet, and duct tape over her mouth.

{¶ 13} E.W. testified appellant began raping her everywhere but, in her anus, and he only stopped for a moment to snort some cocaine and smoke a cigarette:

Q. Okay. Now, when you say he raped you, I don't want to belabor the point, but where was his penis in relation to your body?
A. Everywhere. In my mouth. Everywhere but anal.
Q. Okay.
A. Like he vaginally raped me. He had sat on top of me at one point so I could give him oral sex. It lasted for hours.
Q. Did he do anything else to you?
A. No.
Q. So he forced oral sex on you?
A. Yes.
Q. Did he perform oral sex on you?
A. Yes.

4

Q. So he performed cunnilingus on you as well?
A. Yes.
Q. Okay. Do you remember how long this went on?
A. Hours.

{¶ 14} E.W. stated at one point during the rape, appellant asked her to take a drag from his cigarette and when she asked him to untie her he said: "You made me do this." E.W. testified about what happened next:

Q. Okay. So what happened? I mean, how did this end?
A. Well, I thought it was going to end. This part really gets to me, and I still -- like, it hurts me because I, like, thanked him and everything when he untied me, and I thought I was done. He let me get dressed. And I'm at the door, and he throws me back on the bed and ties me up again and continues to rape me.
* * *
Q. Okay. At that point, did he just force vaginal intercourse on you?
A. Yeah, but he kept on. Like, when I was, like, moving and crying trying to squirm, he's, like, "Bitch, I'll rape you in your ass if you don't stop."
I'm, like, "Please don't," like.
Q. Okay. So after you thought he was going to let you go but he didn't and he kept doing this to you, what happened next? How did you ultimately leave?
A. He said, "Real men have to go to work." He's, like, "I'm going to have to let you go because real men have to go to work."
Q. What happened next?
A. And then I did get dressed, and he said he'll give me a ride. He gave me ride. He gave me his phone number and told me to call him and that he'll pay me the next time I see him.

{¶ 15} E.W. testified she was held by appellant against her will and forcibly raped by appellant from 2:00 a.m. or 3:00 a.m. on April 5, 2018, until 8:00 a.m. After being released by appellant, E.W. called a friend and told him what happened. Her friend agreed to call the police and take her to the hospital when he finished work. According to E.W., after speaking with her friend on the telephone, she had sex with another john for drug money because she was "dope sick." She did recall that she returned to appellant's address with her friend and obtained the license plate number of the vehicle parked outside the residence.

{¶ 16} At the hospital, appellant was seen by Brittany Nicole Rice, a Sexual Assault Nurse Examiner. Rice interviewed E.W. and her medical report was admitted into evidence as State's Exhibit A-1. Rice testified E.W. was tearful but calm during the

interview. Though E.W. showed no latent sign of a physical or internal injury, Rice stated that E.W. did refuse consent to the customary head-to-toe examination. E.W. did permit Rice to obtain swabs from her mouth, anus, and vaginal region for forensic testing. Rice also took a narrative statement about the rape from E.W., and she read the statement to the jury. The narrative statement Rice read into the record essentially sets forth the same details and sequence of events described by E.W. in her trial testimony.

{¶ 17} In 2018, Earl Westfall worked as a detective in the sexual assault unit of the Columbus Police Department ("CPD"). He testified he was contacted by another officer in April 2018 who had received a report of a rape and kidnapping from a friend of the victim. The officer gave Westfall the vehicle description, location, and license plate number obtained from the victim's friend, and the information led him to appellant. The next day Westfall interviewed the victim, E.W. When E.W. was able to pick appellant's photograph out of a photo array administered by another detective, Westfall had enough information to obtain a warrant for appellant's arrest. Appellant was eventually arrested in the state of Washington in September 2018, and a DNA sample was obtained.

{¶ 18} Forensic scientist Lynndsey Simon is employed at the CPD crime lab. Simon performed a forensic analysis of the material on the swabs Rice obtained from E.W. According to Simon, only the vaginal swab contained interpretable DNA, and appellant was excluded as a major contributor. Simon did state that appellant could not be excluded as a minor contributor because the sample contained a mixture of DNA from three or four individuals.

(Doc. 4, at PAGEID #206-211).

On November 14, 2019, the jury found Petitioner guilty on all counts submitted for consideration. For the charges related to E.W., the jury found Petitioner guilty of one count of felonious assault, four counts of rape, and one count of kidnapping. (Doc. 4-1, at PAGEID #714-15). For the charges related to A.D., the jury found Petitioner guilty of two counts of rape and one count of kidnapping. (*Id.* at PAGEID #715). On January 31, 2019, the trial court sentenced Petitioner to an aggregate fifty years' incarceration. (Doc. 4-1, at PAGEID #738-39).

## II.    PROCEDURAL HISTORY

On February 3, 2020, Petitioner filed a notice of appeal to the Ohio Tenth District Court of Appeals ("Court of Appeals"). (Doc. 4, at PAGEID #58-59). Petitioner raised four assignments of error:

(1) It was error for the court to join the two cases for trial.

(2) To the extent the error of joinder is reviewed on a plain error basis, counsel was ineffective for failing to preserve the error.

(3) The guilty verdict, particularly the verdict as to count three involving [E.W.], was against the substantial weight of the evidence. The jury instruction on penetration did not clarify that penetration was a necessary element of the offense.

(4) The verdicts were against the Manifest Weight of the Evidence

(*Id.* at PAGEID #83).

On November 17, 2020, the Court of Appeals issued a decision affirming the convictions and sentences. (*Id.* at PAGEID #206-30). On June 16, 2021, Petitioner filed a motion for leave to file a delayed notice of appeal with the Supreme Court of Ohio. (*Id.* at PAGEID #231-68). Over the state's objection, the Supreme Court of Ohio granted Petitioner's motion. (*Id.* at PAGEID #266-68, 269). On August 3, 2021, the Supreme Court of Ohio *sua sponte* dismissed Petitioner's appeal for failure to prosecute. (*Id*. at PAGEID #270). On September 10, 2021, Petitioner filed a second motion for leave to file a delayed notice of appeal. (*Id.* at PAGEID #271-310). Again, over the state's objection, the Supreme Court of Ohio granted Petitioner's motion. (*Id.* at PAGEID #314). Petitioner submitted a memorandum arguing for jurisdiction (*Id.* at PAGEID #315-44), which the Supreme Court of Ohio declined on February 15, 2022. (*Id.* at PAGEID #345).

### III.    HABEAS PROCEEDINGS

On October 27, 2022, Petitioner, proceeding *pro se*, filed the instant federal habeas petition,

raising the following three grounds for relief:

**GROUND ONE**: The Court of Appeals erred in holding that the trial court did [sic] abuse its discretion when it joined the two indictments for trial over appellant's discretion.

**Supporting Facts**: This is a Due Process Issue that was highly prejudicial to the Petitioner when the Court, ordered the cases joined together. The cases were completely unrelated and involved a different alleged victim in each case. It is evident that the joinder of these counts allowed the jury to consider other acts evidence that would not have been admissible if the charges had been severed for trial. Prejudicial value of this additional testimony outweighed its probative value. Instead of separate trials that carefully limited the admissibility of other acts evidence the petitioner was subjected to one trial where the jury was permitted to consider evidence of two different offenses. This was particularly prejudicial concerning the petitioner's remaining convictions because the evidence supporting these convictions is at best thin. Despite the fact that there is no DNA evidence from the rape kits that brings the petitioner into question as the perpetrator, although four other persons DNA evidence was profiled in the rape kit results. The Petitioner was prejudiced by the consolidated trial, and this court must see the efficacy in reversing and remanding the case back to the trial for further findings.

**GROUND TWO**: The Court of Appeals erred when it found that Appellant's second assignment of error involving ineffective assistance of counsel for not preserving for appellate review the trial court's error of joinder.

**Supporting Facts**: In this case, there was no more important issue than joinder of the indictments. The State failed to make a sufficient proper argument for joinder of the two case[s]. There was circumstantial evidence that the two witnesses knew each other., discussed the case and were prepared by the State of Ohio with key testimony being when the payment of money was made or not. Yet defense counsel failed to object and sufficiently preserve the claim for appellate review. Counsel's failure to do so constitutes Ineffective Assistance of Counsel in violation of the Sixth Amendment.

**GROUND THREE:** The Court of Appeals erred by holding that the record contains sufficient evidence to support the guilty verdict beyond a reasonable doubt and was not against the manifest weight of the evidence.

**Supporting Facts:** In this case, Petitioner was charged with felonious assault, as defined in R.C. 2903. 11(A)(1), which occurs when a person***knowingly *** {c]ause[s] serious physical harm to another. Appellant was charged with Rape under R. C. 2907. 02, which provides "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat offeree.["] *** Petitioner was further

charged with kidnapping pursuant to R. C. 2905. 01, which provides in relevant part" [n]o person shall by force***shall***restrain liberty of the [victim] ***[t]o engages in sexual activity, as defined in section 2907. 01 of the Revised Code, with the victim against the Victim's will.["] R.C. 2905.01(A)(4) Here the Tenth District held that the testimony of the two victims, if believed, provided the jury with sufficient evidence to satisfy the elements of the charged offenses beyond a reasonable doubt. However, Appellant contends that the testimony of the two accusers failed to provide sufficient evidence and that the testimony of the two accusers failed to produce sufficient evidence to satisfy each and every element of the charged offenses beyond a reasonable doubt. Petitioner will be more explicit and precise as to where in the record it can be found once he sees the Trial testimony (to be included in the return of Writ) and can point out exactly where the evidence does not provide sufficient evidence but also exonerates and exculpates him.

(Doc. 1, at PAGEID #5-8).

On January 5, 2023, Respondent filed a Return of Writ. (Doc. 5). Respondent contends that Petitioner's claims are either are non-cognizable, procedurally defaulted, or lack merit. Specifically, Respondent argues that all of Petitioner's claims are non-cognizable in federal habeas corpus review because each are expressed as state law assignments of error. (*Id.* at PAGEID #28, 46, 50). Respondent also argues that Ground One is procedurally defaulted because Petitioner did not fairly present a federal claim to the state courts. (*Id.* at PAGEID #28-32). Respondent further argues that all three grounds for relief lack merit because the Court of Appeals' dismissal of the claims was neither contrary to nor an unreasonable application of federal law. (*Id.* at PAGEID #32-45, 46-48, 50-62).

## IV.     STANDARDS OF REVIEW

### A. AEDPA

Because this is a habeas corpus case, provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA limits the

circumstances under which a federal court may grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in a state court proceeding.

Specifically, under AEDPA, a federal court shall not grant a writ unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors. This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015). Additionally, this Court's habeas review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

**B. Procedural Default**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275-78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Where a petitioner has failed to exhaust claims but would find those claims barred if later presented

to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court. As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that is, they are "procedurally defaulted." It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard). First, the court must determine whether there is a state procedural rule that is applicable

to the petitioner's claim and whether the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138. In order to establish cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001).

## V.    DISCUSSION

### A. Cognizability of the Claims

It appears that Petitioner used the assignments of error from his state appellate brief as the grounds for relief in his federal habeas corpus petition. Respondent argues that because of the way Petitioner has stated his claims, he has only asserted state law claims which are not cognizable in federal habeas corpus review. Considering well-established rules governing the interpretation of *pro se* pleadings, Respondent's argument is without merit. A document filed *pro se* is "to be liberally construed," *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Id.* (internal quotation marks omitted). "All pleadings shall be so construed as to do substantial justice." Fed. R. Civ. P. 8(f). The Court should not dismiss

Petitioner's claims because he copied the form of the state court assignments of error when the substance of those claims includes federal issues of due process, ineffective assistance of counsel, and sufficiency of the evidence.

### B. Procedural Default

Respondent contends that Ground One is procedurally defaulted because Petitioner presented it to the Ohio state courts as a purely state law issue by arguing in his appellate brief that his indictments should not have been joined for trial based on the language and interpretation of Ohio statutes. (Doc. 5, at PAGEID #28-32). Petitioner argues that he did not procedurally default Ground One because he cited federal cases in his state appellate brief. (Doc. 11).

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim, a petitioner must assert both the *legal* and factual basis of his or her claim. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006); *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017).

The record reflects that Petitioner did not fairly present Ground One as a constitutional claim to the Ohio state courts. Petitioner confined his appellate argument to why the joinder was

inappropriate under Ohio's statutes and jurisprudence. (Doc. 4, at PAGEID #90-105). Petitioner did cite two federal cases in his appellate brief, *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964) and *United States v. Riley*, 530 F.2d 767 (8th Cir. 1976). (Doc. 11, at PAGEID 94, 107). However, each of these cases analyze joinder under the Federal Rules of Civil Procedure and neither include a discussion of misjoinder as a denial due process. While these cases were adjudicated in a federal court, the joinder issue was not addressed as a constitutional issue. The inclusion of these federal cases in the Petitioner's appellate brief does not amount to fair presentment of the constitutional issue that Petitioner was denied due process when the trial court joined his indictments for trial.

Petitioner procedurally defaulted Ground One when he failed to fairly present a federal claim to the Court of Appeals. In any event, as discussed below, Ground One lacks merit even if not procedurally defaulted.

### C. Ground One

In Ground One, Petitioner contends that he was denied due process of law because the trial court improperly joined the charges in the two separate indictments for trial. Specifically, Petitioner argues that the evidence against him in each case was "thin," his DNA was not found during the testing of E.W.'s rape kit, and it was prejudicial for the jury to hear the evidence of the unrelated offenses in a single trial. (Doc. 1, at PAGEID #5).

As mentioned above, Petitioner asserted Ground One as his first assignment of error on direct appeal. The Court of Appeals concluded that Petitioner placed his intent at issue by contending the encounters with the victims were consensual and the sexual assaults on each of the two victims were "so similar in time, place and manner of commission that the evidence offered to prove the forcible rape and kidnapping charges in one indictment disclosed purposeful action

on the part of [Petitioner] to commit forcible rape and kidnapping in the other." (Doc. 4, at PAGEID #218). The Court of Appeals determined that Petitioner was therefore not prejudiced by the joinder because evidence of each of the crimes would have been admissible at separate trials. Moreover, the Court of Appeals concluded that Petitioner could not show prejudice because the evidence passed the "simple and distinct" test, meaning the jury would have little trouble separating the evidence relevant to the charges in one indictment from the evidence relevant to the charges in the other. (*Id.* at PAGEID #219).

"Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his ... right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986). A petitioner must show "*actual* prejudice, not merely the *potential* for prejudice." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) (emphasis in original). The Supreme Court has acknowledged the possibility of a due process violation from improper joinder only in dicta. The rule of due process at issue here is "one of the most general in all of criminal law," *Bass v. Burt*, 850 F. App'x 962, 965 (6th Cir. 2021), and "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims[.]" *Id.* (quoting *Woods*, 575 U.S. at 318) (internal quotation marks omitted)).

This Court is bound to defer to the Court of Appeals' conclusion that Petitioner was not prejudiced by the joinder of claims because evidence of each of the sexual assaults would have been admissible at separate trials to prove intent. Habeas relief on Ground One would be denied even if it were not procedurally defaulted.

### D.  Ground Two

In Ground Two, Petitioner contends that his counsel was ineffective for failing to preserve the improper joinder argument for appellate review. Petitioner raised Ground Two as his second assignment of error on direct appeal. The Court of Appeals noted that it reviewed the joinder claim under the abuse of discretion standard, finding that counsel had preserved the claim for review, and dismissed Petitioner's second assignment of error as moot. (Doc. 4, at PAGEID #223).

To establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Id.* at 694.

Ground Two is without merit because Petitioner cannot demonstrate prejudice. The Court of Appeals reviewed Petitioner's second assignment error without any penalty for counsel's failure

to properly object. The Court of Appeals' rejection of Ground Two was neither contrary to nor an unreasonable application of federal law.

### E. Ground Three

In Ground Three, Petitioner contends that his conviction is not supported by sufficient evidence or the manifest weight of the evidence. Petitioner asserted Ground Three as his third and fourth assignments of error on direct appeal. The Court of Appeals concluded that there was sufficient evidence presented at trial to establish the each of the elements of felonious assault, rape, and kidnapping. (Doc. 4, at PAGEID #223-30).

The well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The Supreme Court held in *Jackson* that because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id.*; *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at

319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318-19 & n.13; *see also United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." 567 F.3d at 205. The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011). The Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner...is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

567 F.3d at 205 (emphasis in original).

Petitioner was charged with felonious assault, rape, and kidnapping. Applying the double-layer deferential standard to the case-at-hand, the Court of Appeals' sufficiency determination for each charge is neither contrary to nor an unreasonable application of *Jackson*.

The elements of felonious assault are defined in R.C. 2903.11(A)(1) as when a "person… knowingly…[c]ause[s] serious physical harm to another." Serious physical harm includes "any

physical harm that involves acute pain of such duration as to result in substantial suffering." R.C. 2901.01(A)(5)(e).

The elements of rape are defined in R.C. 2907.02, which provides "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force...Whoever violates this section is guilty of rape, a felony of the first degree." R.C. 2907.02(A)(2) and(B). "'Sexual activity' means sexual conduct or sexual contact, or both." R.C. 2907.01(C). Pursuant to R.C. 2907.01(A), "[s]exual conduct" is defined in relevant part as "vaginal intercourse between a male and female...fellatio, and cunnilingus between persons regardless of sex.... Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

The elements of kidnapping are found in R.C. 2905.01, which provides in relevant part "[n]o person, by force...shall...restrain the liberty of the [victim]...[t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." R.C. 2905.01(A)(4). "Whoever violates R.C. 2905.01 is guilty of kidnapping." R.C. 2905.01(C)(1).

The following trial testimony established the elements of felonious assault, rape, and kidnapping: E.W. testified at trial that after she entered Petitioner's home with the intent of engaging in sex with him for money, he boarded the door to the house and attacked her by placing his hands on her neck and choking her until she "blacked out." (Doc. 4-1, at PAGEID #516-19). A.D. testified that Petitioner forced her to engage in vaginal sex and fellatio without her consent. (*Id.* at PAGEID #491-92). E.W. testified that Petitioner forced her to engage in vaginal sex, fellatio, and cunnilingus without her consent. (*Id.* at PAGEID #519-22). Both victims testified that Petitioner prevented them from leaving his house for the purpose of non-consensual sex. A.D. testified that Petitioner told her that his dogs would eat her if she tried to leave, and Petitioner

prevented her from leaving until he was finished raping her. (*Id.* at PAGEID # 490-92). E.W. testified that she was tied to the bed with physical restraints during the assault. (*Id.* at PAGEID #519). E.W. also testified that Petitioner untied her at one point during the assault but threatened her with anal rape if she resisted. (*Id.* at PAGEID #523).

Petitioner argues that the evidence does not support his convictions because the victims' testimony is not believable, there was no physical evidence of an assault, his DNA was not matched to the rape kit, and there was no evidence that he ever vaginally penetrated E.W. (Doc. 11, at PAGEID #831-34, 853).

Petitioner argues that A.D.'s testimony lacks credibility because she was a drug addict and prostitute. (*Id.* at 854). Petitioner also contends that her story does not make sense because she testified that no demand for payment was made until after both parties removed their clothes and because there is no physical evidence to corroborate the alleged assault. (*Id.* at PAGEID #854). Petitioner argues that E.W.'s testimony lacks credibility because she was a drug addict and was suffering from "dope sickness" at the time of the alleged assault. (*Id.* at PAGEID #856). He points out that no evidence was found during the sexual assault exam that E.W. was choked or physically restrained. (*Id.* at PAGEID #857). Petitioner also argues that E.W.'s account cannot be believed because she had sex with another man after the alleged rape but before she went to the hospital for the sexual assault exam. (*Id.*).

As noted above, the Court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. Petitioner points out perceived conflicts in the evidence and credibility problems with the witnesses, but the Court is bound to defer to the jury's resolution

of those issues *and* the state appellate court's decision that the evidence was sufficient to support the conviction. *Jackson*, 443 U.S. at 319; *Brown,* 567 F.3d at 205.

To the extent Petitioner is asserting that he is entitled to relief because his conviction is not supported by the manifest weight of the evidence, such a claim is not cognizable in federal habeas review. Manifest weight of the evidence is a matter of pure state law, and thus, is not a cognizable claim in habeas. *See, e.g.*, *Ross v. Pineda*, No. 3:10-CV-391, 2011 WL 1337102, at *2-3 (S.D. Ohio Apr. 7, 2011), *aff'd,* 549 F. App'x 444 (6th Cir. 2013).

Petitioner's sufficiency of the evidence claim is without merit because the Court of Appeals' conclusion that sufficient evidence was presented at trial to establish each element of the charged offenses was neither contrary to nor and unreasonable application of federal law. Petitioner's manifest weight of the evidence claim lacks merit because it is a purely state law claim, non-cognizable in federal habeas review.

## VI.    CONCLUSION

Ground One is procedurally defaulted, and alternatively, is without merit. Ground Two and Ground Three are without merit. It is therefore **RECOMMENDED** that the habeas petition be **DENIED,** and this action be **DISMISSED WITH PREJUDICE.**


For the foregoing reasons, the Undersigned **RECOMMENDS:**

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1, 3) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*,

529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendations would not be taken in "good faith," and therefore **DENY** any petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendations, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendations will result in a waiver of the right to have the district judge review the Report and Recommendations *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendations. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may

submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

October 20, 2023                          *s/Peter B. Silvain, Jr.*
                                          Peter B. Silvain, Jr.
                                          United States Magistrate Judge